

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-28-2000

# United States v. Serafini

Precedential or Non-Precedential:

Docket 99-3994

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Serafini" (2000). *2000 Decisions*. Paper 237.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/237

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 28, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 99-3994, 00-3005

UNITED STATES OF AMERICA

v.

FRANK SERAFINI,
        (Appellant in 99-3994)

UNITED STATES OF AMERICA
        (Appellant in 00-3005)

v.

FRANK SERAFINI

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 97-cr-00225-6)
District Judge: Honorable Thomas I. Vanaskie

Argued July 20, 2000

Before: RENDELL and ROSENN, Circuit Judges,
and O'NEILL, Senior District Judge*

(Filed November 28, 2000)

_____

* The Honorable Thomas N. O'Neill, Jr., Senior United States District
Judge for the Eastern District of Pennsylvania, sitting by designation.

          Bruce Brandler, Esq. [ARGUED]
          Office of U.S. Attorney
          Federal Building
          228 Walnut Street
          P. O. Box 11754
          Harrisburg, PA 17108
          Counsel for Appellee/Cross-Appellant
          United States of America

          Sal Cognetti, Jr., Esq. [ARGUED]
          Foley, Cognetti, Comerford & Cimini
          700 Scranton Electric Building
          507 Linden Street
          Scranton, PA 18503
           -and-
          Daniel T. Brier, Esq.
          Donna A. Walsh, Esq.
          Myers, Brier & Kelly
          425 Spruce Street, Suite 200
          Scranton, PA 18503
          Counsel for Appellant/Cross-Appellee
          Frank Serafini

OPINION OF THE COURT

RENDELL, Circuit Judge.

In this appeal, Frank Serafini challenges his conviction
and sentence for one count of perjury in violation of 18
U.S.C. S 1623 (1994).1 Serafini, a popular state legislator in
northeastern Pennsylvania, was convicted based on his
false testimony before a federal grand jury; the grand jury
was investigating a scheme wherein corporate political

_____

1. The District Court had jurisdiction over this federal criminal case
pursuant to 28 U.S.C. S 1331. We have jurisdiction over the appeal from
the final judgment of conviction and sentence pursuant to 28 U.S.C.
S 1291 and 18 U.S.C. S 3742(a)(2), with the exception of the government's
challenge to the District Court's recommendation as to the location of
Serafini's imprisonment; as explained below, see infra pp. 30-31, we
conclude that we have no jurisdiction over the challenge to the
recommendation of a place of confinement.

                                2

contributions were funneled through third-party conduits in violation of federal election laws. In his grand jury testimony, Serafini had denied that he was reimbursed for a contribution he had made to Senator Bob Dole's presidential campaign. In seeking to overturn his conviction, Serafini maintains on appeal that (1) the prosecutor's questioning before the grand jury was insufficiently precise to support a perjury conviction; (2) the District Court was wrong to strike only one aspect of Serafini's indictment, but should instead have dismissed the indictment in full; (3) the government's purported failure to disclose during discovery that its key witness had been re-immunized violated Serafini's due process rights; (4) the District Court erred in several evidentiary rulings, most notably in admitting a digital recording of Serafini's grand jury testimony and in admitting documentary evidence and live testimony concerning other people's participation in the scheme; and (5) the government's evidence was legally insufficient to support a conviction. Serafini also challenges his ten-month split sentence,[2] arguing that the District Court had no basis for a three-level enhancement for "substantial interference with the administration of justice." See U.S.S.G.S 2J1.3(b)(2).[3] The government cross-appeals Serafini's sentence, contesting both the fact and the extent of the District Court's three-level downward departure for exceptional civic or charitable contributions pursuant to U.S.S.G. S 5H1.11. The government also challenges the District Court's recommendation as to where Serafini's sentence should be served, arguing that the facility recommended is not a proper location for "imprisonment" under the Sentencing Guidelines.

We conclude that Serafini received a fair trial in all respects and will affirm his conviction. We further conclude

_____

2. The District Court sentenced Serafini to five months' imprisonment and five months' house arrest as a condition of supervised release. The District Court recommended that the Bureau of Prisons designate the Catholic Social Services of Lackawanna County Residential Program as the location for the imprisonment portion of the sentence.

3. All references in this opinion are to the version of the Sentencing Guidelines that became effective November 1, 1998.

that the District Court's enhancement and downwar d departure were not an abuse of its discr etion, but that its confinement recommendation was subject to question. We will nonetheless affirm Serafini's sentence.

I. Facts and Procedural History[4]

Serafini was subpoenaed to testify before a grand jury that was investigating possible violations of the Federal Election Campaign Act (FECA), 2 U.S.C. SS 431–456.[5] The principal targets of the probe wer e Renato Mariani, president of Empire Sanitary Landfill, Inc. (Empire), and Serafini's nephew, Michael Serafini. The appar ent violations were that Michael Serafini[6] and his secretary had solicited numerous employees, business associates, and family members to make $1,000 contributions to Senator Bob Dole's presidential campaign, and that Michael reimbursed them for these contributions;[7] the resulting transactions between Michael and these "conduits" ther efore allegedly violated FECA. See 2 U.S.C. S 441f ("No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution . . . .").

Serafini allegedly had a close and longstanding connection with Michael and with Empire, a landfill located

_____

4. Because Serafini was convicted after a jury trial, we must defer to the jury's verdict and view the evidence in the light most favorable to the government. See United States v. Davis, 183 F.3d 231, 238 (3d Cir. 1999). Therefore, we recount the government's version of the facts.

5. FECA prohibits corporations from making contributions in connection with any federal election. See 2 U.S.C.S 441b(a). FECA also makes it unlawful for any person to make a contribution in the name of another person (referred to in this opinion as a"conduit"), or for any person to permit his or her name to be used as a conduit. See id. S 441f. FECA limits individual contributions to federal candidates to $1,000 per election per candidate. See id. S 441a(a)(1)(A).

6. Throughout this opinion, we will use the name "Serafini" to refer to Frank Serafini, and "Michael" to refer to Michael Serafini.

7. Michael was in turn reimbursed by an Empire corporate check signed by Renato Mariani. See Gov't Suppl. A. at 48 (chart detailing the flow of the contributions and reimbursement checks).

4

in Pennsylvania. At the time of the events in question, approximately 80 to 90 percent of the waste dumped at Empire originated from out of state, see A. at 1737-38, but legislation was pending in the United States Senate that would have prohibited or restricted the importation of out-of-state waste, see A. at 1784. Empir e lobbied Senator Dole, the Senate majority leader, to alter or block this legislation. See A. at 1798-1804. Serafini had both personal and financial connections to Empire: his nephew Michael was Empire's second-in-command, and Serafini was himself a 50 percent owner of a family partnership that had sold Empire the land on which it operated and that r eceived a $1.50 royalty for each ton of waste disposed at Empire. See A. at 1711, 1897, 2484, 2798, 3442-46, 3606. Serafini's landfill royalty income formed the vast majority of his total income; his annual royalties in 1995-97 ranged from slightly over $800,000 to nearly $1.1 million. See A. at 1322, 1324, 1326. Serafini allegedly played a r ole in Empire's lobbying activities; he wrote a letter in 1986 to the former U.S. Attorney requesting investigation of a Congressman whom Serafini claimed was "holding up a permit" for Empire, see A. at 3439, and he also joined Michael and other Empire officials on a lobbying trip to Washington, D.C. in 1995, see A. at 1644-46.

Serafini was called before the grand jury to answer questions about Michael's having solicited Serafini for a $1,000 contribution and allegedly having reimbursed him for that contribution. When he first appear ed before the grand jury, Serafini invoked his Fifth Amendment rights and was excused. See A. at 226-27. The gover nment then sought and received an order immunizing Serafini so that the government could compel his testimony before the grand jury; the resulting subpoena order ed him to produce "[a]ll documents relative to political contributions you were reimbursed for." A. at 234. During Serafini's appearance before the grand jury, the Assistant U.S. Attor ney informed him that he could be prosecuted if he pr ovided false testimony. See A. at 326. Although Serafini did acknowledge that Michael had solicited and obtained from him a $1,000 contribution to Dole, see A. at 339, he denied that a $2,000 check given to him by Michael that same week was in part a reimbursement for that contribution.

5

Instead, Serafini maintained that the $2,000 pr obably represented Michael's reimbursing Serafini for payments that Serafini made to a mechanic who had fixed Michael's Porsche.[8] The following excerpts from Serafini's grand jury testimony formed the predicate for his subsequent indictment for perjury:[9]

Statement 1:

Q: And did you bring any documents pursuant to the subpoena that required your appearance her e today?

A: I don't have the documents, I don't have documents with me but the subpoena, because the subpoena didn't require any. The way I r ead the subpoena, I have a copy of it, all documents relative to political contributions you wer e reimbursed for, and I was not r eimbursed for any contributions.

A. at 327–28 (emphasis added).

Statement 2:

Q: Well, then why wouldn't he reimburse you for your Dole contribution under the same rationale?

_____

8. At the time of Serafini's testimony befor e the grand jury, the government did not know why Michael's r eimbursement check to Serafini had been for $2,000 rather than $1,000. The government later had grounds to believe that the second $1,000 r epresented reimbursement for a $1,000 contribution that Serafini's legislative aide, Thomas Harrison, had made to the Dole campaign. Serafini had reimbursed Harrison, and so Michael's check to Serafini apparently served to reimburse Serafini both for Serafini's own contribution and for that made by Harrison.

9. These questions and responses are r eproduced here verbatim, except that they have been numbered so that they need not be repeated throughout this opinion. We will r efer to these statements as "Statement 1," etc. Statements 1, 2, 4, and 5 appear as they did in the redacted transcript of Serafini's grand jury testimony; because Statement 3 was eventually stricken in part from the redacted version, it appears here as it did in the original transcript. See infra pp. 10, 11–12 (describing why Statement 3 was not included in the final perjury indictment).

6

A: Because I wanted to contribute to Bob Dole.

Q: And you didn't want to fix his car?

A: Not necessarily --

Q: Oh, I see.

A: -- would you?

Q: I don't know.

A: And $2,000 for a thousand dollar contribution.

Q: $2,000 for what?

A: $2,000 --

Q: What was that last statement?

A: $2,000 this check is for, if I see it correctly?

Q: Right.

A: And my check here is for a thousand dollar contribution?

Q: Right. So you are saying you don't know what the other thousand dollars is for?

A: I would not relate it to that --

Q: What would you relate?

A: -- in my mind.

Q: What would you relate it for?

A: To something else, whether it wasfixing his car, whether it is something else. It could be something else and that's just what I am saying to you now, because when he asked me for a thousand dollar contribution I wrote a check for a thousand dollars, I found no problem with that, I was delighted, I was happy to be able to do it.

A. at 349-350 (emphasis added).

Statement 3:

Q: Is there any check that you received that reimbursed you other than that $2,000 check for

your contribution?

A: No.

Q: Is there another check that you ar e aware of that is connected to this investigation, to this Dole contribution, other than the $2,000?

A: Not other than what you have shown me today, no.

A. at 296 (emphasis added).

Statement 4:

Q: And you have no knowledge, as you sit her e today, or is it accurate that as you sit here today you have no knowledge why Michael issued that check to you for $2,000?

A: I still think the $2,000 would have been just around the time that I was fixing his car, the transmission was gone, I was fixing it, it is just about that amount of money that would have paid for the repair. It could have been for a number of things, but it certainly does not relate to me contributing to Bob Dole. I contribute quite frequently to candidates and those kind of amounts.

A. at 359-360 (emphasis added).

Statement 5:

Q: I am going to wrap this up. I want to make sur e we are absolutely on the same page here, ther e is no misunderstanding. It is your testimony under oath, as you sit here today, that as far as you're concerned, as far as you know, there is no connection between the check that you wrote to Dole for President dated April 27th of '95 for $1,000, check 3781, and the check that you received from the Michael Serafini-Melinda Marcotte account dated April 25th of '95 for $2,000, it is your testimony that there is no connection between these two items?

A: In my mind I can honestly say that ther e is no connection between those two checks, the thousand and the two thousand. In my, I mean in my mind I know I contributed to Bob Dole because I wanted

8

> to contribute to him without reimbursement. The $2,000, I truly believe I cashed that check and spent it to, for another reason, I am assuming it was when I was fixing his vehicle.

A. at 371–72 (emphasis added). About a week after Serafini's appearance before the grand jury, Serafini's legislative aide, Thomas Harrison, testified in fr ont of the grand jury. See Gov't Suppl. A. at 82–122. When the prosecutor confronted Harrison with a r ecently discovered reimbursement check drawn on Serafini's account and deposited to Harrison's, Harrison admitted that Serafini had solicited and reimbursed Harrison for his Dole contribution, see id. at 87–88, and that he[Harrison] had previously lied to FBI agents and to the grand jury about this contribution in order to "protect Frank and kind of insulate him from this," A. at 2631. See also A. at 2670–71; Gov't Suppl. A. at 97.

Based on Harrison's statements and other evidence resulting from the investigation, the grand jury indicted Serafini for perjury. Serafini moved to dismiss the indictment on the basis that the grand jury questioning was insufficiently precise to support a perjury allegation. The United States District Court for the Middle District of Pennsylvania, Chief Judge Thomas I. Vanaskie, dismissed the portion of the indictment that was based on Statement 3, finding that the grand jury questioning with r egard to Serafini's awareness of other checks in the contribution scheme "was so ambiguous and unclear as to pr eclude a perjury conviction." A. at 5 (Dist. Ct. Mem. Op., Apr. 7, 1998). However, the District Court denied the motion to dismiss the indictment in all other respects. [10]

The case proceeded to trial. At trial, Michael did not testify. The government presented as its principal evidence Harrison's testimony regarding his transactions with Serafini; the testimony of other "conduits" describing their own transactions with Michael and with other Empir e officials; and a series of 34 checks, all fr om the same

---

10. The government filed an interlocutory appeal of the District Court's dismissal of the indictment insofar as it related to Statement 3, and we affirmed. See United States v. Serafini , 167 F.3d 812, 824 (3d Cir. 1999).

9

sequence of checks, showing reimbursements paid by Michael to Serafini and to the other conduits. The government also introduced evidence r elating generally to Serafini's financial and personal relationship with Michael and with Empire. The jury convicted Serafini of perjury. Chief Judge Vanaskie then sentenced Serafini to the ten-month split sentence described above. See supra note 2. Serafini now appeals his conviction and sentence.

II. Discussion

A. The Validity of the Indictment

Serafini asserts two challenges to the validity of his indictment: first, that the prosecutor's questioning of him before the grand jury was impermissibly vague, and second, that the District Court's dismissal of the portion of the indictment concerning Statement 3 should have led to its dismissal of the entire indictment. We exercise plenary review over the District Court's denial of the motion to dismiss the indictment. See United States v. Serafini, 167 F.3d 812, 819 (3d Cir. 1999).

For the first proposition, Serafini r elies on Bronston v. United States, 409 U.S. 352, 362 (1973), in which the Supreme Court held that a defendant could not be convicted of perjury for giving misleading, nonr esponsive, but literally true answers to the prosecutor's questions. The Supreme Court emphasized that it is incumbent upon the questioner to frame sufficiently precise questions:

> [T]he perjury statute is not to be loosely construed, nor the statute invoked simply because a wily witness succeeds in derailing the questioner -- so long as the witness speaks the literal truth. The burden is on the questioner to pin the witness down to the specific object to the questioner's inquiry.

Id. at 361. Serafini claims that he did not understand the central concept of "reimbursement" in the same way that the prosecutor did; Serafini says that he did not believe the check from Michael to constitute "reimbursement," because, he, Serafini, would have given money to Dole in any event, regardless of whether Michael paid him back for

10

the contribution. Therefore, Serafini argues, the questions put to him were vague and his answers cannot form the basis for a perjury conviction. This assertion is without merit. Serafini's attempts to transform the common term "reimbursement" into a technical term whose meaning would escape a sophisticated state legislator are unavailing.[11] Furthermore, Serafini's statements before the grand jury go far beyond a denial of "reimbursement." In Statement 2, Serafini said that he would "not relate" the $2,000 check to his $1,000 check for Dole, but would relate it "[t]o something else, whether it was fixing his car, whether it is something else." Statement 4 fleshes out Serafini's assertion that the $2,000 check was related to the car expenditures, "but . . . certainly does not relate to me contributing to Bob Dole." Statement 5 is perhaps the most specific: "In my mind I can honestly say that there is no connection between those two checks, the thousand and the two thousand." These answers, unlike those at issue in Bronston, were directly responsive to the prosecutor's questions and clearly stated that there was absolutely no connection between the check for the Dole campaign and the check received from Michael. These unambiguous questions and responses are sufficient to form the basis for a perjury indictment.

We also reject the argument that the rest of the indictment should have been dismissed merely because the portion relating to Statement 3 was dismissed. The questioning for Statement 3 was vague as to exactly which checks were being discussed; the questions and answers in Statements 1, 2, 4, and 5 simply do not relate to the issue

_____

11. Webster's Third New International Dictionary defines "reimbursement" as "the action of reimbursing" and "reimburse" as "to pay back (an equivalent for something taken, lost, or expended) to someone." Webster's Third New Int'l Dictionary 1914 (1961). The District Court noted the straightforward nature of the dictionary definition, and continued: "As it is used in its common parlance, reimbursement means the delivery of money to a person to pay back that person for money that the person expended for some matter." A. at 23 (Dist. Ct. Mem. Op. Apr. 7, 1998).

of other checks, and, as we have already noted, do not suffer from ambiguity.12

We will therefore affirm the District Court's denial of Serafini's motion to dismiss the indictment.

B. Disclosure of Harrison's Immunity

Serafini claims that the government committed a due process violation during discovery by not disclosing the fact that Harrison had been "re-immunized" fr om prosecution before his second grand jury appearance. Serafini cites the Supreme Court's decisions in Brady v. Maryland and Giglio v. United States as support for the contention that evidence of this type must be disclosed. See Brady v. Maryland, 373 U.S. 83, 87 (1963) (stating that due process r equires the government to disclose material exculpatory evidence upon the defendant's request); Giglio v. United States, 405 U.S. 150, 154-55 (1972) (stating that the government's failure to disclose a promise of immunity made to a critical witness constituted a due process violation, because evidence of an agreement as to immunity was relevant to the witness's credibility). Serafini claims that the gover nment failed to disclose that Harrison was immunized from pr osecution for perjury, see Serafini Br. at 41, and asserts that defense counsel's cross examination of Harrison at trial would have been different in content and appr oach had the defense been aware of this renewed immunity.

The problem with Serafini's claim is that the purported "re-immunization" consists of nothing mor e than the following exchange in the transcript of Harrison's second appearance before the grand jury:

> Q: Now, as it was the last time, you are testifying here
> today under an order of immunity signed by Judge
> Vanaskie, which requires you to testify despite the
> existence of any constitutional privilege against self
> incrimination. That order compels you to testify on

_____

12. Serafini's citation to United States v. D'Alessio, 822 F. Supp. 1134 (D.N.J. 1993), a case in which the counts of the indictment were very difficult to disentangle, and in which ther e was considerable confusion as to whether the underlying behavior was criminal under New Jersey law, is therefore inapposite.

the condition that your testimony may not be used
against you in a criminal case. You do not have
immunity from perjury or making false statements
in your testimony today, do you understand?

A: Yes.

Q: If you commit perjury, or make a false statement,
you can be prosecuted for that perjury or false
statement despite the grant of immunity and your
testimony here today could be used against you in
the prosecution, do you understand?

A: Yes.

Gov't Suppl. A. at 85. This exchange makes it clear that
Harrison's immunity extended only to the underlying
conduct about which he testified; Harrison was not
immune from a subsequent perjury prosecution in the
event that his statements in his second appearance before
the grand jury proved to be false. Serafini does not contest
the government's assertion that the gover nment turned
over the grand jury transcript to defense counsel two weeks
before trial -- well before the time that Brady or Giglio
would require. See Gov't Br . at 38; Serafini Reply Br. at 36.
Because Serafini has not offered evidence of any promises
of immunity to Harrison made outside the grand jury
proceedings,13 we can find no discovery violation on this
record.

C. Evidentiary Rulings

1. Digital Recording

Serafini contends that the District Court abused its
discretion by permitting the gover nment to play for the jury
a digital recording of a redacted version of Serafini's grand
jury testimony.14 The story of the history and chain of

_____

13. Serafini quotes an excerpt from the government's sentencing
memorandum, see A. at 3701-02, as support for the assertion that
Harrison was given blanket immunity -- even fr om perjury at his second
grand jury appearance or at his trial appearance. W e conclude that
Serafini reads more into the prosecutor's offhand use of the word "re-
immunization" than is reasonable given the clear record evidence in the
case.
14. We review the District Court's decisions as to the admissibility of
evidence for abuse of discretion. See United States v. Pelullo, 964 F.2d

13

custody of this recording —- from"original tapes" of the grand jury testimony, to the "redacted tapes," to the "digital version" of these tapes —- is quite complex. However, the relevant facts for our purposes can be succinctly stated.

Serafini argues on appeal that the District Court should not have admitted the digital version of the tapes, because (1) the digital version was not individually authenticated and offered in evidence; and (2) the digital version differs materially from the original version. Serafini cites the report of defense expert James B. Reames; Reames concluded that the redacted copy of the tape contained "severe distortion of the spoken words" as compared to the original tape. A. at 3413. The problem with Serafini's argument is that Reames's objections are directed at the r edacted version, not the digital version, and it is the digital version's content that is the issue presented to us. The r ecording —- which turned out to be the digital recor ding —- was offered in evidence without objection from Serafini, see A. at 1300. Even if we accept defense counsel's contention that he thought the recording being played at trial was the redacted and not the digital version, the lack of objection at trial waived any subsequent objection to the r edacted version, thus obviating the relevance of Reames' r eport.15

As for the digital version, we have no basis for concluding that there were material differ ences between it and the redacted tape. The trial judge compared all three versions of the audio recordings, and could not discern any material differences among the versions. See  A. at 3082-84.16

_____

193, 199 (3d Cir. 1992). To the extent that these rulings were based on an interpretation of the Federal Rules of Evidence, however, our review is plenary. See id.

15. Serafini apparently does not appeal the evidentiary ruling insofar as it held that the redacted version was authentic and admissible. Even if we were to construe Serafini's appellate briefs as raising a challenge to the authenticity of the redacted tape, his lack of objection at trial means
that we could review the District Court's ruling only for plain error, see Fed. R. Crim. P. 52(b), and we find no plain error.

16. It is worth noting that both parties agr eed to Chief Judge Vanaskie's suggestion that he would listen to the tapes to assess whether he could notice a difference among the thr ee versions, and would determine whether a hearing was necessary based on his assessment. See A. at 2794-95, 3068-69, 3070-73.

14

Serafini levels a broad challenge but fails to point to any specific differences between the r edacted and the digital versions. In fact, he maintains that he was unable to tell from the playing of the recording at trial that it was not the redacted version. See Serafini Br . at 22.

We find, therefore, that even if the District Court erred in its decision to play the digital rather than the r edacted version of the recording, it did not af fect Serafini's substantial rights, and was thus harmless. See Government of the Virgin Islands v. Toto, 529 F.2d 278, 283-84 (3d Cir. 1976); see also Chapman v. California, 386 U.S. 18, 23-24 (1967).

2. Conduit Evidence

Serafini argues that the District Court abused its discretion in admitting evidence of the conversations and the transfer of funds in transactions that involved other "conduits" like Serafini -- i.e., other people through whom Michael and Empire funneled contributions -- but did not involve Serafini himself. The evidence admitted by the District Court consisted of reimbursement checks and conduit witnesses' testimony as to the conversations. These conduit conversations fall into two categories: those to which Michael was a party, and those to which he was not. The District Court admitted testimony in both categories.

We conclude that the District Court did not abuse its discretion in admitting the checks that wer e in the same series of checks as the check issued to Serafini, nor in admitting the testimony as to the conversations that involved Michael. In order to prove that Serafini had committed perjury, the government was r equired to demonstrate the falsity of Serafini's claim that the check he received from Michael was not a reimbursement. See A. at 695-96. The fact that the Serafini check was one in a series of apparent reimbursement checks was r elevant to this requirement. Michael's previous actions were relevant to show that Michael, one of the parties to the transaction involving Serafini, understood it as a reimbursement. Serafini argues that even if the checks wer e admissible, the conversations were inadmissible hearsay. W e conclude that the conversations in which Michael was involved wer e

15

admissible under the hearsay exception provided by Federal Rule of Evidence 803(3),17 as evidence of Michael's state of mind at the time of the conversations. Michael's state of mind during these conduit transactions was relevant to show that he intended his check to Serafini to be a reimbursement (as he did with the other conduits); this evidence tends to support an inference that it was Michael's general practice to reimburse contributors for their contributions, and thus that the check to Serafini was in fact a reimbursement.

The admission of the conduit conversations that did not involve Michael had a far more attenuated connection to Serafini's guilt. We find some merit to Serafini's contentions that these were of marginal relevance and were inadmissible as hearsay. However, the evidence contained in these conduit conversations was almost wholly cumulative of the evidence contained in those conversations that did involve Michael, which, as described above, were properly admitted into evidence. We therefore find that the error, if any, in admitting the remaining conduit conversations did not affect Serafini's substantial rights, and was therefore harmless.18

_____

17. We also conclude that the District Court did not abuse its discretion in determining, pursuant to Federal Rule of Evidence 403, that the probative value of these conversations, and of the checks, was not substantially outweighed by their prejudicial effect -- a determination to which we must give "substantial deference." Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 110 (3d Cir. 1999). We note also that the District Court properly gave a cautionary instruction to limit the danger of unfair prejudice. See A. at 3337-38 (District Court's statement that the jury could not consider the conduit evidence to establish Serafini's knowledge).

18. Serafini also raises challenges to other evidentiary decisions made by the District Court, including the exclusion of hearsay concerning the purported car repairs, and the admission of (1) evidence concerning Serafini's financial stake in Empire; (2) evidence that Empire paid Serafini's counsel fees; (3) portions of the agreement to sell Empire; (4) a letter Serafini wrote to his Congressman concerning Empire; and (5) evidence as to Serafini's involvement in Empire lobbying. We find no error in the District Court's rulings or its reasoning on these matters, and will affirm these evidentiary rulings.

16

D. Sufficiency of the Evidence

Serafini's final objection to his conviction is that the government's evidence was legally insufficient to support a conviction for perjury. The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high. "We determine whether there is substantial evidence that, when viewed in the light most favorable to the government, would allow a rational trier of fact to convict." United States v. Helbling, 209 F.3d 226, 238 (3d Cir. 2000) (quoting Government of the Virgin Islands v. Charles, 72 F.3d 401, 410 (3d Cir . 1995)). 18 U.S.C. S 1623(a) provides:

> Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper , document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

Serafini's argument that the evidence is insufficient rests primarily on the fact that the evidence presented concerning Serafini's state of mind was cir cumstantial in nature. However, we have recognized that intent and knowledge may be proven via circumstantial evidence. See United States v. Iafelice, 978 F.2d 92, 97 (3d Cir. 1992); see also United States v. Chapin, 515 F.2d 1274, 1280 (D.C. Cir. 1975) ("[P]erjury cases . . . ar e susceptible to proof by circumstantial evidence, and in fact ar e peculiarly likely to be proven in this manner because one of the elements of the crime is that the defendant knew his statement was false when he made it."). Viewing the evidence in this case in the light most favorable to the government, we find that the evidence -- including but not limited to Harrison's testimony, Serafini's grand jury testimony, and the admissible conduit evidence -- was easily sufficient for a rational factfinder to find that Serafini perjured himself in denying that the $2,000 check was a reimbursement for his

17

and Harrison's contributions to the Dole campaign, and in stating that the $2,000 had nothing to do with these contributions. The evidence was therefor e sufficient to support Serafini's conviction.

E. Sentencing Issues

1. Increase in Offense Level for Substantial Interference

After ascertaining that the base offense level for perjury before a grand jury was 12, see U.S.S.G. S 2J1.3(a), the District Court applied a three-level enhancement for "substantial interference with the administration of justice," id. S 2J1.3(b)(2). An application note to this section of the Guidelines explains:

> "Substantial interference with the administration of justice" includes a premature or impr oper termination of a felony investigation; an indictment, ver dict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

Id. S 2J1.3 (Application Note 1) (emphasis added). The District Court found that Serafini's perjury had caused the unnecessary expenditure of substantial gover nmental resources.

The District Court identified the following expenditures of the government's time: re-interviewing Thomas Harrison after Serafini's appearance before the grand jury, calling Harrison to testify before the grand jury a second time, subpoenaing auto repair shops and PNC Bank for records, interviewing the owner of one auto repair company and the general manager of another, and interviewing Serafini's employee Lucille Yager and requesting Y ager's grand jury testimony. See A. at 3823-24. The defense ar gued that some of these expenditures would have been undertaken even in the absence of Serafini's perjury, claiming in particular that the government had in its possession the bank records showing Serafini's check to Harrison even before Serafini's grand jury appearance. See Serafini Br. at 63. Serafini cites United States v. Jones, 900 F.2d 512, 522 (2d Cir. 1990), for the proposition that a substantial

18

expenditure enhancement cannot be applied wher e the government already had the infor mation that the defendant concealed via her false statements. However, Jones is easily distinguished from our case. Jones r elied heavily on the fact that "the district court did not make any specific finding that Jones' perjury had resulted in any substantial expenditure of governmental resour ces." Id. at 521–22. Here, in contrast, the District Court explicitly made such factual findings. See A. at 3823–27 (transcript of sentencing hearing).19 We review the District Court's factual findings that the expenditures were "substantial" and that Serafini's perjury was a but–for cause of these expenditur es for clear error only, see, e.g., United States v. Sinclair, 109 F.3d 1527, 1539 (10th Cir. 1997), and we find no such error. We therefore conclude that the enhancement for "substantial interference" was permissible.

2. Downward Departure for Community and Charitable
        Activities

The offense level for perjury, adjusted by the three–level substantial interference enhancement, was 15. When combined with Serafini's criminal history category of I, this adjusted offense level resulted in a guideline range of 18 to 24 months' imprisonment. However, the District Court granted a three–level downward departur e for Serafini's community and charitable activities. See A. at 3851–52. The government argues that the District Court's departure is an abuse of discretion.

_____

19. In particular, the District Court explained its conclusion that the government would not have had to re–interview Harrison if Serafini had testified truthfully before the grand jury:

> If Mr. Serafini had testified, truthfully, that he was, indeed, reimbursed and that the other thousand dollars of the $2,000 check was for Mr. Harrison, there would be no need to go see Mr. Harrison, again, who was, to say the least, not the most reliable witness the Government could find, under the circumstances, having already lied to the Grand Jury. So Ifind that but for the Defendant's perjury, it would not have been necessary to interview Mr. Harrison, so that there is the r equisite causal relationship between the interview and calling him to testify before the Grand Jury.

A. at 3824.

19

In Koon v. United States, 518 U.S. 81 (1996), the Supreme Court outlined the methodology for a district court to use when considering a departure fr om the applicable guideline range. We have described the Koon analysis as follows:

> First, identify the factor or factors that potentially take the case outside the Guidelines' "heartland" and make it special or unusual. Second, determine whether the Guidelines forbid departures based on the factor, encourage departures based on the factor , or do not mention the factor at all. Third, apply the appropriate rule: (1) if the factor is forbidden, the court cannot use it as a basis for departure; (2) if the factor is encouraged, the court is authorized to depart if the applicable guideline does not already take it into account; (3) if the factor is discouraged, or encouraged but already taken into account by the applicable guideline, the court should depart only if the factor is present to an exceptional degree, or in some other way makes the case different from the ordinary case in which the factor is present; or (4) if the factor is unmentioned, "the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether [the factor] is sufficient to take the case out of the Guideline's heartland."

United States v. Iannone, 184 F.3d 214, 226 (3d Cir. 1999) (emphasis added) (internal citations to Koon omitted). We also noted Koon's statement that a r eviewing court must give substantial deference to the district court's discretionary decision to depart from the guideline range. See id. at 227 (citing Koon, 518 U.S. at 98).

The District Court described the appropriate analytical steps and correctly determined that departing on the basis of civic and charitable good works was discouraged, but not forbidden, by the Guidelines. See A. at 3839 (transcript of sentencing hearing); U.S.S.G. S 5H1.11 ("Military, civic, charitable, or public service; employment-related contributions; and similar prior good works ar e not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."). The

20

District Court recognized that, in order to depart downward on this basis, it must find that this factor existed "to an exceptional degree or, in some way, that makes the case different from the ordinary case in which the factor is present." A. at 3839. The District Court made a finding that Serafini's civic and charitable contributions did exist to such an exceptional degree, or in an extraor dinary manner. See id.

Our review of the District Court's finding in this regard is quite deferential. See Koon, 518 U.S. at 98 ("[W]hether a discouraged factor nonetheless justifies departur e because it is present in some unusual or exceptional way, [is a] matter[ ] determined in large part by comparison with the facts of other Guidelines cases. District courts have an institutional advantage over appellate courts in making these sorts of determinations . . . "); see also United States v. Jones, 158 F.3d 492, 497 (10th Cir . 1998) (stating that appellate review "is at its most defer ential" when the court of appeals is evaluating "the district court's conclusion that the facts of this case made it atypical"). Our r eview is limited to ensuring that the circumstances r elied upon by the District Court are not "so far r emoved from those found exceptional in existing case law that the sentencing court may be said to be acting outside permissible limits." United States v. Sweeting, 213 F.3d 95, 100 (3d Cir. 2000).

At the sentencing hearing, the District Court was presented with several character witnesses, and more than 150 letters. The letters submitted to the Court fall into three categories: (i) the first category presents Serafini as a good person; (ii) the second category refers to his activities as a state legislator; and (iii) the thir d category refers to his assistance, in time and money, to individuals and local organizations.

(i) As to the first category, these can be quickly dismissed with the observation that being a "good person," a quality indeed to be admired, does not qualify as extraordinary or exceptional civic or charitable conduct.

(ii) As to Serafini's activities as a state legislator, they are work-related and political in character. For example, a letter from the Fire Chief of Greenfield Township Volunteer

21

Fire Company stated that he "had worked tir elessly to obtain grant monies to help the community af ford the lifesaving equipment they need." Sealed Suppl. A. at 20. The same letter also referred to Serafini's guidance "on several projects, including writing bid specifications for a new engine . . . and in pushing through legislation which allows smaller fire companies to purchase equipment through state funding." Id.

Other letters of this nature attest to Serafini's character and quality of legislative service. Others ar e from grateful constituents who were helped by Serafini or his staff. Conceptually, if a public servant perfor ms civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such work from our public servants. While we might question whether our sentencing courts should consider such things as one's situation or opportunity, the methodology that requires us to determine "or dinary" versus "exceptional" and "laudable" versus "extraordinary" is a subjective one that involves comparing a defendant's conduct to the norm. Thus, to the extent this second group of letters does not evidence extraordinary community service under Guideline 5H1.11, but instead, reflects merely the political duties ordinarily performed by public servants, we are of the view that they cannot form the basis of a departur e.

(iii) However, unlike the first and second categories of letters the Court received, the third category of letters provided an adequate basis for the District Court's conclusion that Serafini's community service warranted a downward departure. Many of the letters that fall within this last group contain substantive descriptions of Serafini's generosity with his time as well as his money. Several constituents and friends described situations in which Serafini extended himself to them in unique and meaningful ways during times of serious need. In particular, three letters are especially noteworthy.

William Drazdowski, an accountant and "a close personal friend" of the defendant, explains Serafini's r ole in providing a $300,000 guarantee to Dr. Edward Zaloga so that he could secure new cutting edge data from certain Tokyo physicians for the treatment of his brother's brain tumor.

22

Sealed Suppl. A. at 57. Dr. Zaloga testified at the sentencing hearing that he telephoned Serafini at 1:00 a.m. seeking his assistance in raising the money. Just thirty minutes later, Serafini called back and informed Dr. Zaloga "that everything was in place." The letter does not state who actually made the guarantee, or how it was accomplished. However, the clear import of Zaloga's testimony is that it was Serafini's money: ". . . [N]ot once did he ask me, How are you going to pay me back? Or any other such question. The simple statement, Just get the account numbers, we'll wire the money in the morning." A. at 3786. In reading the Zaloga letter, both Serafini's readiness to help and his reluctance to seek gratitude make a str ong impression. Such behavior is hardly part of the nor mal duties of a local politician.

Another letter came from George E. Seig, who also testified at the sentencing hearing. Sealed Supp. A. at 186-89. He sustained a serious injury as a result of an accident while he was a college student. The physicians' pr ognosis was that he would never be able to carry on any for m of normal social functioning. After a year of frustrating physical therapy, Seig lost all ambition to r eturn to school. Then, he was contacted by Serafini's office who told him that Serafini had heard of the tragic incident and wanted Seig to come work for him. The record r eflects that Serafini's offer of employment went far beyond just hiring a young person on his staff. Serafini took Seig under his wing, mentored him, and strongly encouraged him to attend college. He even loaned him money until Seig could repay it. The letter from Seig -- now an attorney -- reflects his immense gratitude and his feeling that Serafini is responsible for turning his life ar ound.

A third letter came from a widow who appr oached Serafini in tears because she was about to lose her house. He wrote her a personal check for $750 to for estall foreclosure. She expressed doubt about her future ability to repay him, but Serafini insisted that she need not do so unless she could afford it.

The remaining letters, taken as a whole, depict Serafini as an exceptionally giving person. See Sealed Suppl. A. at 137 (describing Serafini's having forgiven a substantial debt

23

out of concern for a divorced mother'sfinancial situation). For example, the letters describe Serafini's volunteer work as an usher at St. Mary's Church, see id. at 35, 40, 107; at the Abington Heights School District, see id. at 166; and at Lackawanna Trail High School, see id. at 200. In addition, he helped to establish a fund to defray the cost of a bone marrow transplant for a man suffering from leukemia. See id. at 209. Several letters note that Serafini was generous with his time even with people who lived outside his district. See id. at 33, 35, 125. The letters also describe Serafini's financial contributions to organizations such as The Arc (a nonprofit agency serving people with mental retardation and their families), see id. at 14; the Rotary Run Against Drugs, see id. at 26; the Scranton–Lackawanna Human Development Agency, see id. at 41, 108; the Little League, see id. at 47; the Boy Scouts, see id. at 109, 118; St. Francis of Assisi Kitchen, see id. at 157; the Abington Heights School District, see id. at 166; and the leukemia sufferer's fund mentioned above, see id. at 209.[20] A letter from an official at the University of Scranton refers to Serafini's financial assistance to college students, see id. at 177, and a letter from a high school social studies teacher describes Serafini's contributions to a scholarship for graduating seniors, see id. at 200.

A former employee noted in one letter that when her friend was sick with leukemia, Serafini did mor e than just permit her to take time off to visit her . He arranged a ride for her friend to Johns Hopkins Hospital in Maryland so that she could obtain a second opinion regar ding her condition. See id. at 215. Other letters indicating that Serafini went above and beyond the call of duty as a public servant described how he had personally financed a second office to enable him to reach more constituents. See id. at

_____

20. Several letters describe contributions to other organizations, beyond those listed above, in terms that indicate that the contributions may be either financial or nonfinancial in natur e. See Sealed Suppl. A. at 67 (Moosic Youth Center and Moosic Lions); id. at 80 (St. Joseph's Hospital, the Red Cross, and the SPCA); id. at 146 (The Mental Health Association); id. at 190 (the Northeast Regional Cancer Institute, the Deutsch Institute, Easter Seals, Friends of the Poor , and the American Heart Association).

35. Additionally, there was significant testimony at the sentencing hearing regarding Serafini's charitable activities, including: giving a man several hundred dollars so his electricity would not be turned off, id. at 3789; paying mortgages, car payments, and the cost of dentur es for those could not afford them, id. at 3791, 3800; and helping a young man start his construction business, id. at 3803.

The District Court concluded that the letters and testimony demonstrated that Serafini had distinguished himself, "not by the amount of money [he has] given, but by the amount of time that [he has] devoted." A. at 3839. The District Court found that these efforts made Serafini's community and charitable activities "exceptional" when compared to what an average person in Serafini's circumstances would have done:

> Those weren't acts of just giving money, they were acts of giving time, of giving one's self. That distinguishes Mr. Serafini, I think, from the or dinary public servant, from the ordinary elected official, and I had ample testimony, today, that says that Mr. Serafini distinguishes himself, that these are acts not just undertaken to assure his re-election, but are taken because of the type of person he is . . . .

A. at 3840.

We realize, as did the District Court, that Serafini's largesse was in part financial, and in part, devotion of himself and his time. Since he is a wealthy individual, we must ensure that a district court does not run afoul of the prohibition against considering socioeconomic differences in relying on financial contributions as a basis for a departure. See U.S.S.G. S 5H1.11; see also United States v. Tocco, 200 F.3d 401, 434 (6th Cir . 2000). However, the District Court here recognized this particular aspect of Serafini's situation, but nonetheless found all his contributions, not merely monetary ones, exceptional.

It is not our role to decide in the first instance whether Serafini's civic and charitable contributions wer e exceptional given Serafini's role as a public servant and his apparent wealth. Our review is far mor e deferential. We conclude that the District Court had an adequate basis for

25

its factual finding, and that the District Court's decision was not clearly out of line with other reported cases. See, e.g., United States v. Woods, 159 F.3d 1132, 1136 (8th Cir. 1998) (upholding defendant's downward departur e for charitable activities, which included bringing two troubled young women into her home and paying for them to attend a private high school, as well as helping to car e for an elderly friend, where the court found no basis to overturn the district court's finding that these ef forts were exceptional).

In reaching this conclusion, we have not overlooked the decision of the Court of Appeals for the Eighth Cir cuit in United States v. Morken, 133 F.3d 628 (8th Cir. 1998). There, the court concluded that the defendant's activities, which consisted of advising local business owners, hiring young people, serving on a church council, and raising money for charity, were "laudable, . . .[but] neither exceptional nor out of the ordinary for someone of his income and preeminence in a small Minnesota town with a population barely over a thousand." Id.  at 630. Accordingly, the court of appeals reversed the district court's downward departure.

However, in Morken, the court essentially found that, given Morken's station in life, his contributions were not extraordinary. Here, the District Court was careful to view Mr. Serafini's activities in light of his career and resources, and taking that into account, found that his charitable activities were in fact sufficiently beyond the norm for a wealthy politician, and were sufficiently exceptional so as to warrant a departure under the Guidelines. While the District Court did not allude to this, we can detect here good works of a different nature and degree than the somewhat impersonal giving that was demonstrated in Morken. Also, we are aware that other appellate courts have second guessed the trial court's view of the "nor m" for good works performed by certain individuals, concluding that a certain defendant did no more than other similarly situated individuals. See United States v. Haversat, 22 F.3d 790, 796 (8th Cir. 1993) (holding that defendant's charitable and volunteer activities did not make him an atypical defendant in antitrust price-fixing cases); see also United States v.

26

Crouse, 145 F.3d 786, 792 (6th Cir . 1998) (finding nine-level downward departure unsupported by defendant's civic contributions, which were not unusual for a pr ominent businessman). These do not provide a basis for finding an abuse of discretion here because, based on the evidence, the District Court could have found, and did find, that Serafini's acts of personal kindness and good works were above and beyond customary political or charitable giving. We also note that while many of Serafini's acts involved the giving of money, the monetary aid was only one aspect of otherwise charitable conduct on his part, distinguishing his acts from the impersonal writing of checks that is the norm for many wealthy individuals. By taking such giving into account, the District Court did not grant the departure based on socioeconomic conditions. We conclude that the District Court did not abuse its discretion by finding that Serafini's civic and charitable contributions wer e exceptional and thus warranted a downward departure.

The government also challenges the extent of the District Court's three-level departure, claiming that this departure was reached by a result-oriented and incorrect methodology. We do not agree. In United States v. Kikumura, 918 F.2d 1084 (3d Cir. 1990), we noted that our scope of review over the extent of the District Court's discretionary departure is deferential. See id. at 1110 ("This [final] step involves what is quintessentially a judgment call. District courts are in the front lines, sentencing flesh-and-blood defendants. . . . Therefore, appellate review must occur with full awareness of, and respect for, the trier's superior `feel' for the case.") (quoting United States v. Diaz-Villafane, 874 F.2d 43, 49-50 (1st Cir. 1989)); see also 18 U.S.C. SS 3742(f)(2), (f)(3) (stating that the courts of appeals should affirm all departures that ar e not unreasonable). However, in Kikumura, we outlined "objective standards to guide the determination of reasonableness," Kikumura, 918 F.2d at 1110, stating that the sentence imposed must be "minimally sufficient to satisfy concer ns of retribution, general deterrence, specific deterrence, and rehabilitation," id. at 1111. We also observed that the appropriate way to meet these goals may often be determined by analogy to specific guidelines or to the structure of the Guidelines in general. See id. at 1112 ("[A]nalogy to the guidelines is also

27

a useful and appropriate tool for deter mining what offense level a defendant's conduct most closely appr oximates."); id. at 1113 ("[B]y attempting to link the extent of departure to the structure of the guidelines, the courts can avoid the kind of standardless determinations of r easonableness that inevitably produce unwanted disparity.") (quoting United States v. Ferra, 900 F.2d 1057, 1062 (7th Cir. 1990)) (internal quotation marks and citation omitted).

The District Court heeded Kikumura's instruction to look to the structure of the Guidelines, but noted that it could not find "any particularly apt analogy" in any specific guideline. A. at 3851. Therefore, the District Court compared the mitigating effect of Serafini's charitable and community contributions with the sentence-enhancing effect of his substantial interfer ence with the administration of justice. The District Court concluded that these two effects were similar in magnitude:

> And there are no other specifically-mentioned adjustments, in this particular case, that pr ovides [sic] a sound foundation for analogic reasoning. I do think, however, that it's appropriate to look at this case as if it were perjury without the enhancement, without the three-level enhancement. I think that an appr opriate downward departure, in this case, is thr ee levels.

A. at 3851-52. In the absence of any clearly r elevant analogy to a specific guideline, we conclude that the District Court did not abuse its discretion in determining that the effects of the enhancement and the downward departure should be similar in magnitude, nor in concluding that the net effect was to r eturn Serafini to the base level of culpability for perjury -- a level 12.

The government's argument that the departure was result-oriented is based on a single statement by the sentencing judge: "And I will say that I am most influenced, in the final decision that I make, that I have departed three levels, that takes me to Zone C." A. at 3852. W e find this statement too ambiguous to support the gover nment's contention that the District Court abused its discr etion. It is not apparent to us, from this one statement, that the sentencing judge meant that the reason  for his departure

28

was to arrive at Zone C of the Sentencing Table. Read in the entire context of the District Court's departure discussion, the statement is equally susceptible to a simpler reading: that the District Court simply found that the result of the three-level departure was to put Serafini in Zone C, not that the goal of the departure was to put him in Zone C.21

3. Recommendation as to Location of Confinement

The government argues that the District Court erred in recommending to the Bureau of Prisons that the imprisonment portion of Serafini's service be served in the Catholic Social Services of Lackawanna County Residential Program. See A. at 3879 (District Court's judgment of sentence). The government asserts that such a facility cannot serve as the location for "imprisonment" within the meaning of U.S.S.G. S 5C1.1, which reads in pertinent part:

> If the applicable guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by --
>
> (1) a sentence of imprisonment; or
>
> (2) a sentence of imprisonment that includes a ter m of supervised release with a condition that substitutes community confinement or home detention . . . provided that at least one-half of the minimum term is satisfied by imprisonment.

U.S.S.G. S 5C1.1(d). We agree with the government's reading of this portion of the Guidelines, and its view that the imposition of a community confinement sentence would violate the Guidelines. However, because the District Court's statement as to the place of confinement was merely a recommendation, i.e., was not a final order

_____

21. Because we conclude that the departur e was permissible, the District Court was correct to calculate a guideline range of 10 to 16 months for Serafini, which placed Serafini in Zone C. The split sentence -- five months' imprisonment followed by five months' home detention -- was appropriate for this guideline range. See  U.S.S.G. S 5C1.1(d)(2).

29

imposed by the District Court, we conclude that we have no jurisdiction to review this statement.22

It is true that under section S 5C1.1 of the Guidelines, "community confinement" cannot constitute "imprisonment" for purposes of fulfilling the requirement that one-half of a split sentence be satisfied by imprisonment. See United States v. Horek , 137 F.3d 1226, 1228-29 (10th Cir. 1998); United States v. Adler, 52 F.3d 20, 21 (2d Cir. 1995); United States v. Swigert, 18 F.3d 443, 446 (7th Cir. 1994); United States v. Jalili, 925 F.2d 889, 892-93 (6th Cir. 1991); see also United States v. Jordan, 734 F. Supp. 687, 688 (E.D. Pa. 1990). Ther efore, if the District Court had so ordered this confinement as satisfying the requirement for imprisonment, it would clearly be reversible error.23 However, we reject the government's contention that we can or must reverse the District Court's sentencing order that included a recommendation to that effect. The District Court recognized that the final decision as to the location of imprisonment was the Bur eau of Prisons'. See A. at 3879 (District Court's judgment of sentence) ("The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of five (5) months. . . . The court makes the following recommendations to the Bur eau of Prisons: The Court recommends that the Bur eau of Prisons designate the Catholic Social Services of Lackawanna County Residential Program, Scranton, Pennsylvania, as the place for service of this sentence.") (emphasis added). Its recommendation, while erroneous, was not an order and is technically not reviewable. See e.g., United States v. Pineyro, 112 F.3d 43 (2d Cir . 1997) (per curiam). In our

_____

22. Because we conclude that we have no jurisdiction over this portion of the government's cross-appeal, we need not reach Serafini's argument that the government forfeited this issue by failing to raise it in the District Court.

23. In fact, a district court has no power to dictate or impose any place of confinement for the imprisonment portion of the sentence. Rather, the power to determine the location of imprisonment rests with the Bureau of Prisons. See 18 U.S.C. S 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment."); see also Jalili, 925
F.2d at 892.

view, the recommendation did not amount to the imposition of a community confinement sentence. The sentence the District Court imposed -- namely five months' imprisonment -- was appropriate and we will affirm it. That part of the order that contains the recommended place of imprisonment -- which would violate the guidelines if followed by the Bureau of Prisons -- is either beyond our jurisdiction, or, if reviewable as part of the order, a nullity. We think the former is the better analytic route. We need not disturb a suggestion or recommendation, and have no power to do so because our review is limited to a sentence imposed in violation of the law or imposed as a result of an incorrect application of the Sentencing Guidelines. See 18 U.S.C. SS 3742(a)(1), (a)(2). While the gover nment correctly notes that the community confinement sentence, if imposed, would violate the law, we do not see the place of Serafini's commitment as having been imposed by the District Court, and we will not reverse the sentencing order on that basis because we lack jurisdiction over the District Court's recommendation.

III. Conclusion

For the foregoing reasons, we will AFFIRM the District Court's orders of conviction and sentence.

ROSENN, Circuit Judge, Concurring in part and Dissenting in part:

I concur and join with the majority except with r espect to Part E(2) pertaining to the Downward Departur e for Community and Charitable Activities. For reasons set forth below, I respectfully dissent from this aspect of the opinion.

The trial judge tried this hard fought case skillfully, patiently and without error. However , I believe that when it came to sentencing, the voluminous letters fr om the defendant's political constituents, colleagues, and other friends misled the Court to depart downward fr om the Guidelines. The majority appropriately r ejects the first two categories of these letters but concludes that the third category of letters provide "an adequate basis" for the District Court's conclusion to depart downwar d. Maj. op. at 22. In reaching its conclusion, the majority gives "quite deferential" review to the District Court's finding that Serafini's civic and charitable contributions did exist to an exceptional degree, or in an extraordinary manner. Maj. op. at 21.

The general rule of "deference" is not without limitation: it has many restraints. It must be consistent with Congressional purpose and, in this case, the Sentencing Guidelines. Even in cases where administrative agencies enjoy much deference in interpreting their own regulations, Justice Jackson has stated that the weight of defer ence "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, .. . , and all those factors which give it power to persuade, if lacking power to control." Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), quoted affirmatively in General Electric Co. v. Gilbert, 429 U.S. 125, 141–142 (1976). Accor d, Daughters of Miriam Ctr. for the Aged v. Mathews, 590 F.2d 1250, 1258 (3d Cir. 1978).

Although I agree wholeheartedly that the District Court's sentencing finding is entitled to deference,"this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history." Teamsters v. Daniel, 439 U.S. 551, 566 n.20 (1979) (quoted in Southeastern Community College v. Davis,

32

442 U.S. 397, 411 (1979)). When invoked as a guide to the exercise of judicial action, discretion must be sound, and not exercised arbitrarily or without regar d to what is right and equitable under the circumstances and the law. See Koon v. United States, 518 U.S. 81 (1996).

Discretion, like the hole in a doughnut, does not exist except as an area left open by a surrounding belt of restriction. See Ronald Dworkin, T aking Rights Seriously 31 (1977). Discretion, even the discretion r esting with a sentencing trial judge, must be restricted by the applicable statutory meaning, purpose and history. The United Sates Sentencing Guidelines, which apply here, whether we empathize with them or find them frustrating, ar e binding upon the sentencing judge and the appellate courts. See Mistratta v. United States, 488 U.S. 361 (1989)(holding that the Guidelines are constitutional). Unless courts uphold the surrounding belt of restriction, discr etion, even the little discretion that remains with a judge under the Sentencing Guidelines, will override the parameters of statutory limitation.

Prior to the Sentencing Reform Act (SRA) of 1984, 18 U.S.C. S 3551 et seq., 28 U.S.C. SS 997-998 (the "Act"), the federal sentencing system had been "predominantly standardless and indeterminate." Federal Sentencing Manual, G.T. McFadden, J.C. Clarke, J. L. Staniels, S 1.01[2]. The Act created the United States Sentencing Commission and empowered it to promulgate guidelines and policy statements pertaining to sentencing decisions. "Those statutory changes and the guidelines have significantly altered the scope and natur e of judicial discretion." Id. at 1.01[3]. In enacting the SRA, Congress was concerned not only with equal punishment to offenders who commit crime, but also with the need to pr omote respect for the law and to limit judicial discr etion in sentencing. Id. at 1.64.

The Sentencing Guidelines are clear that a defendant's record of charitable work and community service are a discouraged justification for a sentencing departure. See United States v. DeMasi, 40 F.3d 1306, 1324 (1st Cir. 1994). The historical note to the Civic and Charitable Amendment to the Guidelines (S 5H1.11) "expresses the

33

Commission's intent that the factors set forth in this part are not ordinarily relevant in deter mining whether a sentence should be outside the applicable guideline range; but that, unless expressly stated, these policy statements do not mean that the Commission views such factors as necessarily inappropriate to the determination of the sentence within the applicable guideline range."

Discouraged-feature factors are not usually relevant to a departure decision. See Koon v. United States, 518 U.S. at 95. A court may depart only if a discouraged factor is present to an exceptional degree or in some other way that makes the case different from the or dinary case where the factor is present. See id., at 96. Ther efore, a downward departure from the Sentencing Guidelines on the ground of community and charitable activities is only appr opriate if the defendant performed charitable acts to an exceptional degree. This appears to be a recognition that in our culture and society, every person is expected reasonably to contribute charity to the poor and to non-pr ofit organizations dedicated to educational, health, and religious purposes.1

Thus, the critical question is whether the discouraged factor is present in this case to "an exceptional degree or in some other way that makes this case differ ent from the ordinary case where the factor is pr esent." The majority, relying on United States v. Jones, 158 F.3d 492 (10th Cir. 1998) and United States v. Woods, 159 F.3d 1132 (8th Cir. 1998), concludes that the District Court had "an adequate basis," maj. op at p. 27, for its departur e. In Woods, the District Court allowed a one level departure to a woman who pleaded guilty to one count of bankruptcy fraud. The District Court found that the defendant's money laundering offense fell outside the "heartland" of such cases and that taking two troubled young women into her own home and paying for them to attend a private high school warranted the departure. In affirming, in one paragraph of a five page

_____

1. According to a national survey by Independent Sector on "Giving and Volunteering in the United States," appr oximately 69% of all households in the United States made voluntary contributions to charity in 1995. See Statistical Abstract of the United States 404 (1999).

34

opinion, the court did not even cite or discuss the Guideline under which it affirmed the departur e, but merely stated "we have no basis for holding that [the ef forts by the defendant] were not [exceptional]." Unlike the Woods case, we have a substantial record here fr om which to assess. It shows that Serafini's charitable works wer e not exceptional or extraordinary by any reasonable standar d.

United States v. Jones, cited by the majority, is inapposite. Jones was charged with unlawfully possessing a firearm. The District Court r elied on eleven factors for departure, not merely the defendant's long history of community service. Among these factors were the aberrant nature of defendant's conduct in unlawfully possessing a firearm, the collateral consequences of his incarceration in the economically depressed community in which he lived, his "highly unusual" voluntary disclosur e of circumstances of his making a false statement to obtain the fir earm, his post-offense conduct, and the negative ef fect incarceration would have on both the quality and quantity of Jones's rehabilitation. See Jones, 158 F .3d at 504. The Government criticized the District Court's inclusion of community service as a factor, but as the appellate court noted, "the Government provides nothing in the r ecord to the contrary." Id. at 500-01. But, ther e is substantial evidence in our record to the contrary generated by Serafini himself. Also, Serafini suffers from an absence of the other factors that played a dominant role in the Jones court's decision to depart.

In the ordinary course of events, a taxpayer , especially one with substantial annual income, will specifically list every available charitable contribution as a tax deduction in his federal income tax return. Serafinifiled such returns and specifically claimed charitable deductions. These returns are the best evidence of his charitable contributions; they are not vague, indefinite opinions of friends and political constituents tendered to a sentencing judge in an effort to obtain a reduced sentence. The tax returns are concrete evidence of Serafini's charitable giving, and are the most logical place to begin an analysis of whether his charitable acts were exceptional.

The defendant is not only "a wealthy individual," maj. op at 25, but his federal income tax retur ns show substantial income from sources other than his salary as a state official. Included are substantial royalties from the Empire Landfill. A financial analysis of his pertinent income returns for the period 1991 through 1996 reveals the following undisputed evidence.

| YEAR | $ TOTAL INCOME ROUNDED | $ CHARITABLE DEDUCTIONS | CHARITY AS % OF INCOME |
|------|------------------------|-------------------------|------------------------|
| 1991 | 724,019 | 13,407 | 1.8 |
| 1993 | 857,000 | 22,604 | 2.6 |
| 1994 | 855,000 | 16,620 | 1.9 |
| 1995 | 908,172 | 17,385 | 1.9 |
| 1996 | 1,101,276 | 20,310 | 1.8 |

Except for 1993, in which his contributions exceeded 2%, all of his contributions are less than 2% per annum. Donating less than 2% of one's income to charity-- even 2.6% -- is lackluster and pedestrian by any measur e; it is not exceptional. It is far below the average measur e of giving in the United States by people in the defendant's socioeconomic status.2

Serafini's charitable contributions of his annual income is ordinary at best when compared to national figures. It

_____

2. According to the Statistical Abstract of the United States, the average American household contributed 2.2% of its income to charity in 1991. See Statistical Abstract of the United States 404 (1999). In 1993, the average was 2.1%. See id. In 1995, the average was 2.2%. See id. In 1995, households with greater than $100,000 income contributed 3.4% of their household income to charity. See id.  According to a 1999 report by the Independent Sector, of the American households that gave to charity, in 1998, they contributed 2.1% of their income; in 1995, 2.2% was contributed; in 1993, 2.1% was contributed; in 1991, 2.2% was contributed; in 1989, 2.5% was contributed, and in 1987, 1.9% was contributed. See Statistical Abstract of the United States 391 (1997); http://www.independentsector.or g/GandV/s_keyf.htm>>.

pales in comparison to tithing, the practice in many religious organizations of giving ten per cent of one's income to one's religious institution. Serafini's charitable contributions are extraordinarily low  when considering that many religious institutions throughout history have encouraged charitable giving in addition to the tithe. See Carl Bakal, Charity USA 21 (1979).

Serafini appears to have made many appearances at public events, but he did not contribute money or r esources according to his means. He has helped some people with small debts, cost of indentures, and other acts of kindness, but he never paid out any exceptional amount of money. The District Court was sensitive to this; it observed that the defendant had distinguished himself "not by the amount of money [he has] given, but by the amount of time that [he has] devoted." Maj. Op. at 25.

As noted, the majority and the District Court wer e persuaded by Serafini's non-financial charitable acts. But much of Serafini's civic participation was either honorary or obligatory because of his job as a Representative. Numerous letters submitted on his behalf wer e written by constituents or other beneficiaries of his public position. The majority finds three letters noteworthy. Maj. Op. at 22. One comes from William Drazdowski, "a close personal friend," which explains defendant's role in providing a $300,000 guarantee to Dr. Edward Zaloga to enable him to obtain new medical data from Tokyo physicians for the treatment of his brother's brain tumor . The doctor testified that thirty minutes after a telephone call to him at 1:30 a.m. for assistance, Serafini called back to tell him "that everything was in place." Neither Drazdowski, an accountant, nor Dr. Zaloga claim that Serafini personally made the guarantee; nor does the defendant. Ther e is no information how the guarantee was accomplished, to whom it was made, who made it, and the substance of the guarantee, or the relationship between Dr . Zaloga and the defendant. The majority believes this assistance"is hardly part of the normal duties of a local politician." On the other hand, the entirely obscure and mysterious incident may very well have its genesis in defendant's political agenda. In any event, it hardly rises to the level of significant community service.

37

The Seig letter attests to Serafini's offer to employ Seig, a young friend of the family, on the defendant's legislative staff, a loan to him of an unstated sum of money, and encouragement to Seig to attend college. The third letter reports a personal check of $750 from the defendant to a widow who was about to lose her home through foreclosure. The widow expressed doubt about her ability to repay and defendant insisted she need not do so unless able.

These three "noteworthy" letters do reflect commendable action by the defendant, but neither they, nor the other letters, show community service to an exceptional or extraordinary degree. A few acts of personal kindness to individual friends do not add up to community service; they do not fulfill the purpose of the Guidelines. The District Court relied considerably on the defendant's gift "of time." I can find no evidence of the amount of time given to community service, as distinguished from some personal favors to friends and political constituents.

The Guidelines do not suggest a sentence departure for time spent aiding friends or family, or time in performing acts of kindness -- even unusual acts of kindness to individuals. Construing such personal acts to individuals as exceptional community service under the Guidelines opens up an area as vast and deep as the Seven Seas. The Guidelines speak in terms of community service and there is nothing in the record of this case that definitively shows Serafini gave community service, independent of his political activities. The 1999 Statistical Abstract of the United States reveals that in the year 1995, persons in the United States with income of $100,000 or more contributed an average of 4.4 hours per week to volunteer work without monetary pay. In this case, although Serafini earned many times more than $100,000 in 1994 and 1995, we have no record that he gave any amount of time to volunteer work, whether it was for one or more weeks during the year, or for fifty-two weeks.

The cases support the foregoing analysis. Courts may not leniently interpret the requirement of extraordinary circumstances to grant a downward departure. See, e.g., United States v. Rybicki, 96 F.3d 754, 758 (4th Cir. 1996) (Defendant was a highly-decorated Vietnam veteran, had

38

saved an innocent civilian during the My Lai massacr e, and had served with the Secret Service; these deeds did not warrant a departure); United States v. McHan, 920 F.2d 244, 247 (4th Cir. 1990)(Defendant's work history, family ties and responsibilities, and extensive contribution to the town's economic well-being could not justify downwar d departure.)

United States v. Morken, 133 F.3d 628 (8th Cir. 1998), contains factual similarities to this case, particularly with respect to the defendant's socioeconomic status. In commenting upon the defendant's commendable r ecord as a neighbor and good friend who advised local business owners, hired young people, served on his chur ch council and raised money for charity, the court ther e also noted that the defendant's annual income exceeded $500,000. The court found that it was "neither exceptional nor out of the ordinary for someone of the defendant's income and preeminence" in his small community to engage in charitable works and community services of this nature." Id. at 630. The majority here notes, maj. op. at 26, that the Morken court found that given Morken's station in life, his contributions were not extraordinary. Her e, Serafini's annual income over the years was substantially higher than Morken's, and for several years prior to his indictment, was almost double. Serafini's contributions, like Morken's, were not exceptional or out of the ordinary. Serafini's contributions were even less exceptional, considering his much larger income and preeminence.

We have no information of recor d of time spent by Serafini in behalf of fund raising efforts or other services of the United Way or the colleges and other community service organizations in his county. In United States v. Crouse, 145 F.3d 786 (6th Cir. 1998) the defendant, Crouse, served on the boards of various community organizations over many years. In commenting on his service in connection with his request for sentencing departure, the court of appeals observed:

> Crouse's community works, while found to be significant by the District Court, are not unusual for a prominent businessman. Examples of Crouse's community involvement include church activities;

service on the boards of various community organizations, including a local hospital, the United Way, and regional airport authority; and his membership and active involvement with the Rotary Club. These examples of community involvement spanned over at least a 25-year period.

Crouse, 145 F.3d at 792.

Measured by any reasonable standar d, whether it be tithing to his church and community, or other charitable contributions of money or community time, Serafini's charitable and community service was far from exceptional or extraordinary. It was quite ordinary for a man in his preeminent position and financial cir cumstances. Nor were his charitable contributions or community services of the level or character exacting personal sacrifice, a deprivation of something of substance because of his contributions.3

I therefore conclude that it was imper missible under the Guidelines for the District Court to depart fr om the Sentencing Guidelines.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

3. According to Laurie Nieb, Coordinator for the Archdiocese Office of Stewardship in Denver, Colorado, sacrificial giving means "a gift that impacts your life; give from your sustenance, not your abundance." The Denver Post, October 21, 1999, Section A , pg. A-01.