

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-6-2004

# USA v. Wright

Precedential or Non-Precedential: Precedential

Docket No. 03-1800

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Wright" (2004). *2004 Decisions.* Paper 755.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/755

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

No. 03-1800
_____

UNITED STATES OF AMERICA

v.

LAWRENCE W. WRIGHT

Lawrence Wright,
                              Appellant

_____

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

District Court Judge: Honorable
Gregory M. Sleet
(D.C.  No. 01-cr-63)

Submitted Under Third Circuit LAR
34.1(a)
January 22, 2004

Before:  ALITO and CHERTOFF,
Circuit Judges, and DEBEVOISE,[*]
District Judge
(Opinion Filed: April 6, 2004)

_____

[*]The Honorable Dickinson R.
Debevoise, District Judge of the United
States District Court for the District of
New Jersey, sitting by designation.

JENNIFER-KATE AARONSON
Potter, Carmine & Hodas
840 North Union Street
P.O. Box 514
Wilmington, DE 19899

*Counsel for Appellant*

RICHARD G. ANDREWS
Office of the United States Attorney
1007 Orange Street
Suite 700
Wilmington, DE 19801

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

ALITO, Circuit Judge:

This is an appeal from a final
judgment in a criminal case. Lawrence W.
Wright was convicted and sentenced for
conspiring to transport stolen property in
interstate commerce, transporting stolen
property in interstate commerce, money
laundering, and making false statements
in a matter within the jurisdiction of the
federal government. All of these offenses
related to a scheme to steal money from
the Church that the defendant served as
pastor. We affirm.

I.

Lawrence W. Wright was the pastor
of the New Mt. Olive Baptist Church ("the
Church") in Wilmington, Delaware. The
Church maintained multiple bank
accounts. One of these, the "General

Account," was controlled and reviewed by Church officials, but another, called the "Fire Account," was under the defendant's sole control. The intended purpose of the "Fire Account" was to help the needy.

Al O. Plant, Sr., ("Plant") was an elected member of the Delaware House of Representatives. Under a Delaware Department of Transportation program that was popularly called the Suburban Street Funds ("SSF") program, each elected state representative was allocated a share of money to spend on transportation-related projects in the representative's district. Plant had control over the funds for the City of Wilmington. Plant ceded control of his SSF funds to the City, and in return, the City created an account with an equivalent amount of money that would be spent on non-profit human services projects as Plant requested. For purposes of simplicity, we will refer to the latter funds as Plant's SSF funds.

According to the government, Plant made SSF moneys available to the defendant, and the defendant used these funds for his own personal use and for bribes for Plant. In May 1999, Wright wrote to Plant requesting $50,000 for a "bus being used for seniors' transportation to the doctor, clinic, hospital, and trips during the day." Plant then contacted the City of Wilmington and requested that it write a check for $49,449 from his SSF to Wright. The City drew a check for $49,449 payable to Wright on an account at the Wilmington Trust Company in Wilmington. The defendant immediately deposited the check into the Fire Account at the Sun National Bank. After the check was deposited, it was sent to a third-party processor, then to First Union Bank, and then across state lines to the Federal Reserve Bank in Philadelphia, Pennsylvania, from which it was returned to Wilmington Trust Co.

After these funds were deposited in the Fire Account, the defendant began to disburse them for purposes having nothing to do with transportation or assisting the needy. He caused $8,500 to be transferred into his personal account, and he caused $8,500 to be transferred into Plant's personal account. In early August, the defendant wrote himself a check for $8,000 on the Fire Account and deposited the check in his personal account. Later in the month, he arranged for transfers of $8,000 and $3,500 from the Fire Account into Plant's personal account.

In May or June of 1999, Plant enticed Delaware State Representative Helen Keeley to make $50,000 of her SSF money available to him. In October 1999, the defendant wrote to Plant and requested $35,000 to "completely construct a new sidewalk" in front of the Church. A short time later, Keely, at Plant's request, signed a letter authorizing the transfer of $50,000 from her SSF to the Church. When the defendant received the check, he deposited it in the Fire Account, and this check, like the previous check drawn on the Wilmington Trust Co., was cleared through the Federal Reserve Bank in

2

Philadelphia.

Although the money from Representative Keeley's SSF funds was supposed to be used to construct a sidewalk, no repair or reconstruction of the sidewalk was ever done. Instead, money from the Fire Account was again diverted to the defendant and Plant. In November 1999, the defendant drew an $8,000 check on the Fire Account payable to Plant, and he arranged for the transfer of another $8,000 from that account to Plant's account. During the month of November, the defendant wrote himself approximately $21,000 in checks on the Fire Account. In December 1999, he wrote a check for $1,500 from the Fire Account to a body shop to pay for repairs to his Mercedes.

In July 2000, Plant took action in response to a request from the defendant for money to repair a house so that it could be used as an outreach ministry. Plant authorized $50,000 to be paid from his SSF to the Church. Once again a check was drawn on the Wilmington Trust Co., the defendant deposited the check in the Fire Account, and the check was cleared through the Federal Reserve Bank in Philadelphia. After this money was deposited in the Fire Account, the defendant transferred funds from that account to himself and to Plant. He wrote Plant a check for $5,600, and on several occasions he wrote checks to himself, deposited the checks in his personal account, and then used that account to write checks for Plant in the same amount as the checks that he had originally written

to himself. In addition, during a period of approximately five weeks after the deposit of the money in the Fire Account, the defendant wrote other checks on that account for himself and family members totaling $22,100.

In September 2000, the defendant was interviewed by two FBI agents. During one interview, he said that the Church had received only $99,449 of SSF, as opposed to the $149,449 that had actually been received. He also told the FBI agents that the Church had used the part of the proceeds from the first Wilmington Trust Co. check (for $49,449) to make a down payment on a new bus and that the rest had been used for incidental Church expenses or a reserve account. He claimed that the remaining $50,000 had been used to repair the Church, to refurbish an old bus, and to initiate a senior citizen's program. The next day, the defendant was again interviewed by two agents and said that the Church had used the $49,499 check for its reserve account and for day-to-day Church expenses and that the Church had used the $50,000 check to buy computers, to overhaul the bus, and to defray various other Church costs.

On March 25, 2001, a grand jury returned a 19-count indictment against the defendant, charging him with one count of conspiring to transport stolen property in interstate commerce, in violation of 18 U.S.C. §371; three counts of causing the transportation of stolen property in interstate commerce (one count for each of

3

the three checks for SSF funds), in violation of 18 U.S.C. §§ 2314 and §2(b); four counts of money laundering, in violation of 18 U.S.C. §1956(a)(1)(B)(I); nine counts of bribery, in violation of 18 U.S.C. §666; and two counts of making false statements to the FBI, in violation of 18 U.S.C. §1001.

The defendant moved to dismiss the counts of the indictment that involved the transportation of stolen goods in interstate commerce. He argued that those counts were defective because they did not allege that he knew that the stolen property would travel in interstate commerce. See United States v. Wright, 194 F.Supp.2d 287, 291 (D. Del. 2002). He also urged the District Court to dismiss the bribery counts on the ground that they did not implicate any federal interest. Id. at 296.

The District Court denied the motion to dismiss. The Court ruled that the interstate element of 18 U.S.C. §2314 is purely jurisdictional and that therefore it was not necessary for the defendant to have known that the property was going to travel in interstate commerce. Id. at 290-95. The Court also held that it could not conclude at that juncture that a sufficient federal interest was not implicated, but it invited counsel to raise the issue again after trial. Id. at 295-301.

The defendant was then tried before a jury. During the trial, the defendant claimed that he had stolen money from the Church to repay cash loans from Plant, who had loaned the defendant money to help him pay his gambling debts. The defense argued that while this theft was wrong, it was not a federal crime. The jury found the defendant guilty on all counts.

The defendant filed a post-trial motion for judgment of acquittal in which he renewed the arguments that he had made in his earlier motion to dismiss. The District Court granted the motion with respect to bribery counts[1] but refused to dismiss the other counts.

The District Court sentenced the defendant to 51 months of imprisonment. In doing so, the District Court rejected the defendant's request for a downward departure based on his charitable work. The defendant then took this appeal.

## II.

### A.

The defendant first argues that the evidence at trial was insufficient to prove that he willfully caused another person to violate 18 U.S.C. §2314 (transportation of stolen items in interstate or foreign commerce). The defendant contends that a person cannot willfully cause property to be transported in interstate commerce

---

[1]Neither the propriety of the District Court's partial inquiry into the facts relating to this issue prior to the trial nor its ultimate decision on this issue is before us in this appeal.

4

without knowing that the property will be transported in interstate commerce, and he maintains that the evidence does not show that he had such knowledge. We reject this argument because the defendant's interpretation of 18 U.S.C. §2314 and 18 U.S.C. § 2(b) is incorrect.

**1.**

It is clear that a defendant who personally transports stolen property in interstate commerce may be convicted of violating 18 U.S.C. § 2314 without proof that the defendant knew that the transportation was in interstate commerce. Section 2314 provides in relevant part:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more *knowing the same to have been stolen, converted or taken by fraud* . . .
> Shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 2314 (emphasis added).

This language does not require proof that the accused knew that the transportation of the stolen property was "in interstate or foreign commerce." Rather, the only requisite knowledge is knowledge that the property was "stolen, converted or taken by fraud." Thus, the text of § 2314 is alone sufficient to show that knowledge of the interstate commerce element is not necessary.

Moreover, even if the statutory text were less clear, there would be strong reasons to doubt that Congress intended to require such proof. For one thing, very few lay people understand the breadth of the terms "in interstate or foreign commerce," and therefore except in the most obvious cases – i.e., where the property actually crosses state lines or an international border – proof of such knowledge would be very hard. It is unlikely that Congress intended to create such an obstacle.

More important, there is no apparent reason why Congress would have wanted to demand proof of such a state of mind. Such proof is certainly not constitutionally required. Proof of interstate or foreign transport is required to ensure that prosecutions under 18 U.S.C. § 2314 reach only conduct that Congress may properly regulate under the Commerce Clause, the constitutional provision under which § 2314 was enacted, but the Commerce Clause empowers Congress to regulate interstate and foreign commerce regardless of whether the persons engaging in that conduct realize that it falls within the scope of the Clause.

There is also no apparent policy reason for requiring proof that a person charged under § 2314 knew that the

property was transported in interstate or foreign commerce. The presence or absence of such knowledge seems to have little relation to either the blameworthiness of the conduct or the harm that it produces.

Finally, case law strongly supports the conclusion that § 2314 does not necessitate proof that the defendant knew that the interstate element was present. Numerous courts of appeals have held that the portion of § 2314 at issue here does not require proof that a defendant knew that the transportation was in interstate commerce or even that transportation in interstate commerce was reasonably foreseeable. See United States v. Lack, 129 F.3d 403, 410 (7th Cir. 1997); United States v. Scarborough, 813 F.2d 1244, 1245-46 (D.C.Cir.1987); United States v. Lennon, 751 F.2d 737, 741 (5th Cir.1985); United States v. Newson, 531 F.2d 979, 981 (10th Cir. 1976); United States v. Ludwig, 523 F.2d 705, 706-08 (8th Cir.1975); United States v. Powers, 437 F.2d 1160, 1161 (9th Cir.1971); United States v. White, 451 F.2d 559, 559-60 (6th Cir.1971); United States v. Mingoia, 424 F.2d 710,713(2d Cir. 1970). Cf. United States v. McElroy, 644 F.2d 274, 277 (3d Cir. 1981)(stating that "[m]ost opinions hold that the interstate commerce requirement is satisfied if, after the defendant negotiates a forged check, it travels interstate in the bank collection process"). For all of these reasons, we hold that 18 U.S.C. §2314 itself does not require that the accused know or intend for the stolen property to be transported across states lines.

## 2.

The defendant argues, however, that knowledge of transportation in interstate commerce is nevertheless demanded when a defendant is charged under 18 U.S.C §2(b) with causing another person to violate 18 U.S.C. §2314. The defendant first notes that a person is guilty as a principal if the person "*willfully* causes an act to be done which if directly performed by him or another would be an offense against the United States." 18 U.S.C. § 2(b)(emphasis added). In the present case, the defendant contends, the "act" in question is the transportation of stolen goods in interstate commerce, and he argues that a person cannot "willfully" cause a person to transport goods in interstate commerce without knowing that the goods will travel in interstate commerce. This argument is also wrong.

First, the language of 18 U.S.C. §2(b) does not require the conclusion that the defendant reaches. Suppose, for example, that a defendant willfully causes another person to take stolen goods from point A to point B without realizing that these points are in different states. In that situation, the defendant may be viewed as having willfully caused another person to perform an act (transporting the goods between points A and B) "which if directly performed by [the defendant] would be an offense against the United States." See United States v. Feola, 420 U.S. 671, 687 (1975). The defendant's lack of knowledge that points A and B are in different states would not alter this

6

conclusion.

Second, since a defendant who is charged with personally transporting stolen property in interstate commerce need not know that the transportation is in interstate commerce, it is difficult to see why Congress would have wanted to require such knowledge in a case in which a defendant is accused of causing another person to commit the same offense.

Third, precedent strongly supports this reading. Although our Court has not decided the precise issue presented here, in United States v. Gumbs, 283 F.3d 128, 131 (3d Cir. 2002), we addressed a very similar question. In Gumbs, the defendant was convicted of causing a false claim to be made or presented to a federal department in violation of 18 U.S.C. § 2(b) and § 287. The defendant argued that the "willfulness" element in 18 U.S.C. § 2(b) meant that he could not be convicted without proof that he knew that the claim would be presented to a federal department, but we disagreed. We noted that "the Supreme Court has held that a defendant generally need not be aware of the existence of a jurisdictional element to be guilty of a federal offense." Id. at 131 (citing United States v. Feola, 420 U.S. at 672-73, and United States v. Yermian, 468 U.S. 63, 75 (1984)).[2] Although Gumbs did

not concern 18 U.S.C. § 2314, its reasoning seems fully applicable in the present situation.

Looking beyond the decisions of our own Court, we see that no fewer than six other courts of appeals have rejected the precise argument that the defendant now advances. See Lack, 129 F.3d at 409-10; Scarborough, 813 F.2d at 1245-46; Lennon, 751 F.2d at 741; Newson, 531 F.2d at 980-81; Ludwig, 523 F.2d at 706-08; Powers, 437 F.2d at 1161.

We are aware that the First Circuit has suggested in dicta that the requirement of willfulness in 18 U.S.C. § 2(b) might

---

[2] In Feola, the defendant was convicted of violating 18 U.S.C. §371, by conspiring to assault a federal officer, in violation of 18 U.S.C. §111. After first holding that a defendant may violate 18 U.S.C. § 111 without knowing that the victim of the assault is a federal officer, 420 U.S. at 676-86, the Court went on to reject the proposition that, in order to be guilty of conspiring to violate 18 U.S.C. § 111, a conspirator must know that the intended victim was a federal officer. Id. at 686-96.

In Yermian, the defendant was convicted under 18 U.S.C. § 1001, which makes it a crime to "knowingly and willfully" make false, fictitious, or fraudulent statements in a matter within the jurisdiction of a federal department or agency. The Court rejected the argument that conviction under this statute necessitates proof that the defendant knew that the statements were made in a matter within the jurisdiction of a federal department or agency.

7

demand proof that a defendant charged under 18 U.S.C. § 2314 either knew or should have reasonably foreseen that the property would be transported in interstate commerce. United States v. Leppo, 177 F.3d 93, 96-97 (1st Cir. 1999). However, the Leppo court did not actually decide whether such proof was needed because it found that the record was sufficient to show that the defendant intended for the property to pass in interstate commerce. Id. at 97. Furthermore, we believe that the Leppo court read too much into the passage from Pereira v. United States, 347 U.S. 1 (1954), on which its dicta was based.

In Pereira, a defendant, Pereira, was convicted of causing a check procured by fraud to be transported in interstate commerce, in violation of 18 U.S.C. §§ 2341 and 2(b). See 347 U.S. at 4, 8. The evidence showed that Pereira fraudulently obtained a check drawn on a California bank and then presented the check to a bank in Texas. Holding that the evidence was sufficient to support conviction under 18 U.S.C. §§ 2314 and 2(b), the Supreme Court stated that the following elements had to be proven:

> (1) knowledge that certain property has been stolen or obtained by fraud, and (2) transporting it, or causing it to be transported in interstate commerce.

It is noteworthy that the Court did not list knowledge that the property would be transported in interstate commerce as one of the elements of the offense.

Turning to the question whether the evidence was sufficient to establish that Pereira caused the check to pass in interstate commerce, the Court wrote:

> When Pereira delivered the check, drawn on an out-of-state bank, to the El Paso bank, for collection, he "caused" it to be transported in interstate commerce. It is common knowledge that such checks must be sent to the drawee bank for collection, and it follows that Pereira intended the El Paso bank to send this check across state lines.

Id.

Although this passage notes that Pereira intended for the fraudulently obtained check to cross state lines, we do not interpret the Court's opinion to mean that such knowledge was needed for conviction. The Court certainly did not state that such knowledge was required; on the contrary, as previously noted, the Court's enumeration of the elements of the offense made no mention of such knowledge. Moreover, Pereira did not argue that such knowledge was required, and the question that the Court was addressing in the passage quoted above was simply whether there was sufficient evidence that the defendant caused the check to travel in interstate commerce.

8

Therefore, we must respectfully disagree with <u>Leppo</u> to the extent that it suggests that <u>Pereira</u> supports the conclusion that such proof is required.

For all these reasons, we hold that the prosecution in this case was not required to prove that the defendant knew that the stolen property would be transported in interstate commerce.

**B.**

In a related argument, the defendant contends that the District Court erred when it denied his motion to dismiss the counts of the indictment charging violations of 18 U.S.C. §§ 2314 and 2(b). The defendant maintains that those counts were deficient because they did not allege that he knew that the stolen goods would be transported in interstate commerce. As discussed above, however, such knowledge is not a necessary element of the crime.

Furthermore, even if the "willful[ness]" required by 18 U.S.C. § 2(b) did demand proof that the defendant knew that the stolen property would be transported in interstate commerce, we have already held that "'[w]illfulness' need not be expressly stated in [an] indictment charging a violation of 18 U.S.C. §2." <u>United States v. Krogstad</u>, 576 F.2d 22, 29 (3d Cir. 1978).

**III.**

The defendant next argues that the District Court erred in refusing to admit testimony concerning Plant's statements to his lawyer and testimony concerning Plant's good moral character.

**A.**

The defendant claims that, under Federal Rule of Evidence 807, the District Court should have admitted testimony by Plant's attorney, Kathleen Jennings, regarding statements that Plant made to her before his death. According to the defense proffer, Jennings would have testified that Plant had told her that he carried large sums of cash to make loans to friends. The defendant claims that the context in which Plant made these statements -- confidential communications with his attorney -- provided strong indicia of trustworthiness.

Under the Federal Rules of Evidence, hearsay is not admissible unless it falls under one of the enumerated exceptions. <u>See</u> Fed. R. Evid. 802. In addition to providing numerous specific exceptions, <u>see</u> Fed. R. Evid. 803, 804, the Federal Rules of Evidence contain a "residual exception" for certain other trustworthy hearsay statements. Fed. R. Evid. 807. This provision states in relevant part:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay

rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807.

Rule 807 is "to be used only rarely, and in exceptional circumstances" and "appl[ies] only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." United States v. Bailey, 581 F.2d 341, 347 (3d Cir. 1978). See also Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 112 (3d Cir. 2001)("Rule 807 should only be used in rare situations.")

Here, the District Court found that Plant's statements to his criminal defense attorney lacked the guarantees of trustworthiness that Rule 807 demands. The District Court reasoned as follows:

> While it is true that Plant's confidential relationship with his attorney is one indication that Plant's statements would be truthful, other circumstances of Plant's conversation with Jennings provide insufficient circumstantial guarantees of trustworthiness. Plant's statements to his attorney were not under oath, and there was no penalty for him lying to his attorney. Additionally, the circumstances surrounding Plant's meetings with his attorney contained incentives for him to lie. Plant's statements were self-serving statements made at a time when he knew he was under investigation and had a motive to not tell the truth. Human nature is to deny committing crimes, especially for a public figure who is held in high esteem by the community and knows he is under investigation. In light of these considerations, the court concludes that the hearsay statements at issue are not sufficiently reliable to merit admission under the residual hearsay exception.

Wright, 206 F.Supp.2d at 617.

A trial judge's finding on the question whether hearsay possesses the

10

guarantees of trustworthiness required by Rule 807 is reviewed for clear error, Copperweld Steel Co. v. Demag Mannersmann Bohler, 578 F.2d 953, 964 (3d Cir. 1978), and we see no clear error here. Although it is not in the best interests of persons implicated in criminal investigations to lie to their attorneys, the trial judge noted that it is not unusual for them to do so. Moreover, as the trial judge observed, a public official whose career is dependent on maintaining a reputation for integrity may find it particularly difficult to admit criminal wrongdoing, even in a confidential communication to an attorney. Thus, we hold that the trial judge did not commit clear error in finding that Plant's statements to his lawyer lacked sufficient guarantees of trustworthiness.

The defendant argues that Copperweld Steel Co v. Demag Mannersmann Bohler, supra, shows that the trial judge erred. In Copperweld Steel, Copperweld contended that another company, Demag, had supplied it with unsatisfactory machinery. See 578 F.2d at 956. Demag argued that a Copperweld officer, Holmquist, was fully aware of and accepted the risks presented by the machine in question. Id. Holmquist died before the trial, and Demag was permitted to introduce a memorandum in which a Copperweld attorney recounted statements made by Holmquist concerning the machine. Id. at 963-64 & n. 14. The trial judge found that the memorandum possessed sufficient guarantees of trustworthiness to permit the admission of Holmquist's statements under the residual exception, and our Court affirmed.

Copperweld does not persuade us that the District Court erred in the present case. The circumstances in the two cases were substantially different, and an assessment of the guarantees of trustworthiness relating to any statement is necessarily highly fact-specific. That the Copperweld trial judge did not commit clear error in finding that the statements at issue there possessed sufficient indicia of reliability hardly shows that the trial judge in this case erred in finding that Plant's statements did not. Accordingly, we hold that the District Court did not err in refusing to admit Plant's statements.

**B.**

The defendant also claims that the District Court erred when it refused to admit evidence that tended to show Plant's good character. The defendant contends that such evidence was relevant to show that Plant was not involved in the illegal scheme with which the defendant was charged and that this would have supported his defense that "there was no conspiracy or agreement." Appellant's Br. at 40. The defendant argues that evidence of Plant's good character was admissible under Federal Rule of Evidence 404(a)(1) because Plant was an unindicted coconspirator and therefore an "accused." This argument is without merit.

Federal Rule of Evidence 404(a)(1) provides (emphasis added):

11

Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
(1) Character of Accused.--Evidence of a pertinent trait of character *offered by an accused*, or by the prosecution to rebut the same.

The term "accused" is usually used to denote a defendant in a criminal case, see, e.g., BLACK'S LAW DICTIONARY 23 (6th ed. 1990)(defining "accused" as "[t]he generic name for the defendant in a criminal case"), and the Federal Rules of Evidence generally conform to this usage. See Fed. R. Evid. 104(d), 608(b), 609(a), 803(22), 804(b)(3). In Rule 412, where the term is used in a broader sense, the Advisory Committee Note so states. See Fed. R. Evid. 412, Advisory Committee Notes, 1994 Amendments.

In Rule 404(a)(1), the term "accused" appears clearly to have been used in the conventional sense to denote a criminal defendant. Rule 404(a)(1) codified a deeply rooted common law rule. See Fed. R. Evid. 404(a)(1), Advisory Notes, 1972 Proposed Rules, Notes to Subdivision (a). This common law rule permitted *a criminal defendant* to introduce pertinent evidence of good character. See, e.g., MCCORMICK ON EVIDENCE § 191 (5th ed. 1999)(emphasis added)("The common law and the Federal and Revised Uniform Rules of Evidence permit *the defendant*, but not the government, to open the door to character evidence."); 22 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5236 at 380 (1978)(emphasis added)(Rule 404(a)(1) "codifies the common law rule giving *the criminal defendant* a choice of either remaining under the protection of the general rule [barring the use of character evidence to prove conduct] or opening up the issue of character by introducing evidence that his character is good to support an inference that he did not commit the crime charged"); CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 101 at 544 (2d ed. 1994)(emphasis added)(Rule 404(a)(1) is based on a deeply rooted tradition that "allows *the defendant* in a criminal case to introduce evidence of a pertinent trait of his character as circumstantial proof that he did not commit the charged crime"). We have found no support for the proposition that Fed. R. Evid. 404(a)(1) was meant to sweep more broadly. Nor have we found cases interpreting the term "accused" as used in that provision as referring to anyone other than a criminal defendant. Consequently, we reject the defendant's argument that this provision applies to an unindicted coconspirator.[3]

---

[3]Furthermore, even if Plant could be regarded as an "accused," Rule 404(a)(1) would not permit *the defendant* to offer

## IV.

The defendant claims that he is entitled to a new trial due to "prejudicial spillover" from the evidence that was admitted to prove the bribery counts on which the District Court granted judgment of acquittal. Contrary to LAR 28.0(a)(1), the defendant's opening brief did not identify any place in the record of the proceedings before the District Court where this argument was made. In its brief, the government asserted that the issue of prejudicial spillover was not raised "in any relevant pleading," including the defendant's motion for a new trial. Appellee's Br. at 44. The government argued that because the defendant had not raised the issue of prejudicial spillover in the District Court, the proper standard of review is plain error. Id. The defendant filed a reply brief and addressed the issue of prejudicial spillover but said nothing in response to the government's contention that the issue had not been raised in the District Court in any relevant pleading. See Reply Br. at 14-15.

Under these circumstances, we need not reach the merits of the argument that prejudicial spillover requires a new trial. Rule 33 of the Federal Rules of Criminal Procedure authorizes a trial judge to grant a new trial "[o]n a defendant's motion." Under this rule, "a judge has no power to order a new trial on his own motion." Fed. R. Crim. Proc. 33, Advisory Committee Notes, 1966 Amendments. A judge "can act only in response to a motion timely made by a defendant."[4] Id. Accord United States v. Newman, 456 F.2d 668, 669-70 (3d Cir. 1972). Indeed, even if a defendant moves for a new trial, a trial judge may not grant a new trial on a ground not raised in the motion. Id. at

---

evidence of Plant's good character. Rule 404(a)(1), which is entitled, "Character of Accused," refers to "[e]vidence of a pertinent trait of character offered by an accused." Thus, Rule 404(a)(1) permits an accused to offer evidence of the accused's own character. It does not permit one accused to offer evidence of another's character.

[4] Courts have recognized a few narrow exceptions to this requirement. For example, under some circumstances a trial judge may sua sponte grant a mistrial and order a new trial, and a judge may treat a motion for judgment of acquittal as a motion for a new trial if "the arguments underlying the motion [for judgment of acquittal] justify a new trial." See 3 CHARLES ALAN WRIGHT, NANCY J. KING, AND SUSAN R. KLEIN, FEDERAL PRACTICE AND PROCEDURE (CRIMINAL) § 552 at 459-60, 463 (2004). However, no recognized exception applies here. The trial judge did not grant a mistrial, and the defendant's motion for judgment of acquittal did not raise (and logically could not have raised) the issue of prejudicial spillover.

670-72.

In the present case, the defendant did not move for a new trial based on prejudicial spillover, and therefore the District Court could not have granted a new trial on that ground. In any event, even if the defendant had moved for a new trial based on prejudicial spillover and the trial court had denied the motion, we would not reverse. The only evidence that would not have been admissible if the bribery counts had not gone to trial was minor, dry, and technical. We see no realistic likelihood that the strategy of the parties on the other counts would have been altered in any way or that the jury's verdicts on those counts would have been affected. See United States v. Murphy, 323 F.3d 102, (3d Cir. 2003).

V.

The defendant's final argument is that the District Court erred in holding that it lacked the power to grant a downward sentencing departure based on the charitable acts that the defendant performed as a minister. We disagree.

U.S.S.G. § 5H1.11 provides as follows:

> Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a

sentence should be outside the applicable guideline range.

A District Court, however, may grant a downward departure if a defendant has made civic or charitable contributions "to an exceptional degree or, in some way, that makes the case different from the ordinary case in which the factor is present." United States v. Serafini, 233 F.3d 758, 772 (3d Cir. 2000); see also United States v. Jordan, 130 F.Supp.2d 665 (E.D.Pa. 2001). This is a hard standard to meet.

In Serafini, a panel of our Court considered the application of this standard to good works performed by a state legislator. In that case, more than 150 letters were submitted to the District Court in an effort to persuade the Court to impose a lenient sentence, and the Court granted a downward departure grounded on the defendant's community and charitable activities. See 233 F.3d at 772. The panel affirmed the downward departure based solely on those letters that referred to the defendant's "assistance, in time and money, to individuals and local organizations." By contrast, the panel stated that the contents of other letters that referred to the defendant's "activities as a state legislator" could not form the basis for a departure. The panel wrote:

> Conceptually, if a public servant performs civic and charitable work as part of his daily functions, these

14

should not be considered in his sentencing because we expect such work from our public servants.

Id. at 773. The panel thus drew a distinction between "the political duties ordinarily performed by public servants" (which "cannot form the basis of a departure") and "extraordinary community service" (which can).

We do not understand the discussion in Serafini to mean that a person whose occupation involves charitable or civic work can never qualify for a downward departure based on extraordinary good works that relate to that occupation. Such a rule would lead to anomalous results. For example, a physician who earns a high income in private practice while also making extraordinary contributions in providing health care to the poor might qualify for a downward departure, while a physician who gives up the possibility of a career in private practice to work full time in a low paying job devoted to helping the poor would not. Rather than endorsing such a regime, the discussion in Serafini stands for the proposition that "the political duties ordinarily performed by public servants" – the sort of duties that are generally needed to stay in office – cannot qualify. It is, rather, only when an individual goes well beyond the call of duty and sacrifices for the community that a downward departure may be appropriate. See, e.g., United States v. McHan, 920 F.2d 244, 248 (4th Cir. 1990) (disapproving of the idea that a rich defendant can simply write checks to a charity and later ask for a downward departure.)

Here, the District Court recognized that the defendant's contributions to the community were "profound," "substantial," and "sustained," App. 60, but the Court nevertheless denied the motion for a downward departure. In doing so, the Court stated:

> The Third Circuit [in Serafini] has guided us with regard to charitable works and contributions of community religious leaders, and said that if a public servant performs civic and charitable work as part of his daily functions, these should not be considered in a sentencing because we expect such work from our public servants.

Id. at 61.

The District Court, however, did not end with this observation but went on to acknowledge testimony that no other member of the clergy in the district engaged in some of the types of good work that the defendant performed. Id. The Court stated that this work was "certainly commendable" but that it was "not persuasive in this situation." Id. The Court explained:

15

It may seem harsh to say, and I guess it is, but the Court also believes it cannot permit the defendant to hide behind the very community from whom he stole. He solicited money which he purported to use to help parishioners of his Church and the community at large. Instead he used the money, as we have heard uncontested testimony, to do things, personal things fix up his car, his son's house, and to gamble.

Thus, the Court will not downwardly depart based upon the defendant's civic work and charitable contributions.

Id. at 61-62.

As we understand the basis for the District Court's decision, the Court held that, the defendant's net charitable and civic contributions – taking into account both the good and bad that he did in his capacity as a member of the clergy – cannot be considered as so extraordinarily positive as to warrant a downward departure. We agree with this analysis and with the District Court's conclusion that the requested downward departure was not permitted.

**V.**

We have considered all of the defendant's arguments and have found no ground for reversal. The defendant's conviction and sentence are therefore affirmed.

_____

16